May it please the court, my name is Seth Kessler on behalf of the warden. I'd like to reserve five minutes for rebuttal please. Fine. Petitioner Bies was granted a writ of habeas corpus on one claim by the district court and that was a Brady claim. The warden put in his brief several procedural arguments but would like to focus mostly on the merits of the brief. The area where we think the district court erred was applying the standard for a Brady violation. A Brady violation is only prevalent if it's a reasonable probability that the evidence that was not disclosed would have changed the outcome of the case. The district court in ruling that there was a Brady violation characterized the state's week at trial. We think that is where the major error by the district court happened. In this case we have a confession from Petitioner Bies and it's corroborated by physical evidence that was found at the scene of the crime such as some of the bruising that was on Aaron Rains, the hair and blood that was on some of the weapons used, all were corroborated with the Petitioner Bies' confession. The district court said the confession was weak partially because they applied a standard of a general susceptibility for mentally retarded people during police questioning. The record here simply doesn't demonstrate that any course of activity occurred. That's supported by the fact that the district court specifically found that Petitioner Bies' statements to the police were voluntarily given when he ruled against him on his first three grounds of his habeas corpus petition. We respectfully think that the district court made that error. The confession, the jury would have seen the confession in light of the evidence, the corroborating evidence and that's what they would have convicted on. There's nothing in the alleged undisclosed information that has ever been made into what could have been admissible evidence and nothing that's been determined that would have undermined the confession when the jury would have faced it. Unless the panel has any questions, I'll yield the rest of my time. Please the court, Dennis Sipe. I represent Mr. Bies. I don't really know if the court would want me to reserve time in as much as this is a case where we are also an appellant in the sense that we filed a cross-appeal. I'm happy to just go through my argument. Okay, that would be fine. Thank you. Thank you very much, Your Honor. It's our position that the district court was correct with regard to the Brady violation. And frankly, our position is that the Brady violation that he found, the district court could have found even more because what the judge focused on was one Roger Cordray. And Mr. Cordray, interestingly enough, also confessed to this particular crime. Not to one person, not to two, but to at least three different people. In addition, he was at the scene. He was there. They found evidence that he was there. And he had, I believe, particularized information and knowledge of the injury sustained by the decedent. It was clear that this child sustained serious head injuries. And Mr. Cordray, in his description to others as to what took place, said that he had grabbed the child by the legs and swung around. If you can imagine an ice skater or an ice dance team or figure skater swinging around, he was swinging around with the child, smashing the child's head onto the brick. And that is totally consistent with the injuries that were found on the child's head. And in addition to Mr. Cordray's confession, and again, these are items that the government did not turn over, Mr. Hessler confessed both to the rape-murder. A Claude Justice they were aware of was an individual whose sexual orientation was toward males and had been propositioning young boys in the area. A Ray Moore was found in the building looking, he said, they found his fingerprints. He said he was looking for the victim, trying to assist in finding where the victim was. However, he was doing his looking before the victim had ever been reported to be missing. And there was also an escapee, a Garland Inman, who the police even were looking for phone records because he had escaped and left. And then they found out that he was back in that very area at the time and they had interest in him because of his past behavioral history as it relates to youth. So what did the district court say about those other people? That did not believe that that evidence would have been usable, I believe, would probably be the best way to put it. That there would be no way to get that evidence into the case. And I would respectfully disagree with the court. And I would disagree in part for the reason that one of the things typically a defense attorney should do is point out to the jury what were the shortcomings in the investigation that the police conducted. Was there a rush to judgment in pointing at one particular person? And in this particular case, that evidence would have been available. Did you not know about this person? Did you not know about that? It would come in under a records exception in 804, Ohio's Evidence 804 rule, and would have been appropriate cross-examination material. In addition, and I think it's very important when it comes to any Brady violation, is that I suppose one speculates, but you shouldn't speculate very well, that competent counsel, upon being told that there are other people that were in the area, would have wanted to interview them. They may have produced, if nothing else, witnesses to the very event that took place. And when the government decides not to grant that or give that evidence, and again you have to remember this was a prevalent activity, unfortunately, in Hamilton County at the time Mr. Bias was accused, because they were using a system called a homicide book. And what that meant is that the investigative agency, the police department, gave to the prosecutor the evidence that police officers thought the prosecutor needed. This was the very same system that was used in Jamison, a case from this very court. In that particular case, I think it was assistant prosecutor Pete Meyer who later testified in the deposition about that practice. The prosecutor's office was not given all of the evidence. They were given what the police thought the prosecutor's office needed for prosecution. And so oftentimes, unfortunately, in Mr. Bias' case as a prime example, the police decided, well, that wasn't going anywhere. Because another suspect turned out to be the deceased young man's brother, who was probably the last person to see the boy alive. So what did the state courts say about this policy? Have they weighed in on this policy? They haven't ever weighed in, as I understand it, on this policy, ever. They dodge this policy every time because it historically comes up in post-conviction. And in post-conviction, we rarely ever get a ruling on the merits, ever, in a case on post-conviction. At least I've never gotten one, and I've done more than one of these. But the Hamilton County Police Department, do they realize that when the police do not hand this information along, that they're nevertheless liable to get a Brady objection down the road? Your Honor, I know they do now. And they do in part because, again, of this court's decision in Jameson, specifically finding that it was a Brady violation. And I know that, again, according to, again, the assistant prosecutor, Pete Meyer, that they have now, that policy changed in 1994. This case occurred in 1992. Yeah. And so they obviously have learned, if you will, their lesson, and they're now asking the governmental agency, whatever agency that might be that was investigating, to turn over the file so that they would make a determination. And, of course, again, much of these cases occur, may not even occur today, because we've had a change in Ohio's rule with regard to criminal discovery that says the prosecutor should turn over everything they have, period. And, again, in the jurisdictions in which I commonly practice, I get the entire file. But if that rule is that the prosecutor should turn over everything that they have, the key problem is whether the police are giving it to the prosecutor. Precisely. And in this case, it is clear they didn't turn it over. It didn't come to Mr. Bias's counsel's attention until they were in habeas corpus and they got a chance to see everything. They then went back to the court, the trial court, and went back up with no ruling other than it wasn't a Brady violation in essence. And, of course, we went back to the, well, I shouldn't say we, my predecessors went to the district court, and the judge agreed, at least as to Mr. Cordray. So was this decided on the merits in the state court, or was it decided that there was procedural default? Procedural default, specifically found, again, by the Court of Appeals. So then what is your position as to our standard of review? De novo. It's the first time anybody's had a chance to hear it. It should review it fully. So that would be my positions on that. So are there other issues than the Brady issue that you want? Well, the other issue, just briefly, Mr. Bias has an IQ somewhere between 50 and 60. As a 12-year-old, they tested him, and it was 50. As an adult, it is 60, and as a result of testimony on an Atkins claim in Hamilton County, the death penalty portion of his sentence was removed. He is in the .04 percentile of the population of the United States, as far as his IQ goes. He was interrogated for roughly 26 hours, and when there were discrepancies, as the officers put it, they turned off the tape recorder in each instance. Excuse me, Counsel, did they testify to that? Did the police concede that they had had the tape machine off and on? Yes. That occurred during the motion to suppress. Okay. Yes, Your Honor, I apologize. It's during those times that Mr. Bias seems to make his most damning statements. Didn't the police claim they turned off the tape recorder at your client's request? Only at the end. The rest of the time, they were turning it off to talk about discrepancies, and that's what they testified to at the suppression hearing. And I'm sorry, again, I just have difficulty with that. I've done this for 40 years. I've been a prosecutor. I've been an assistant attorney general. I've been a defense lawyer, and I'm an acting judge. And as far as I'm concerned, when you tell me that you're turning off the tape recorder, there are reasons beyond there are discrepancies. And we're dealing again with Mr. Bias. Mr. Bias really is likened to a, if nothing else, a youth. The officer said, well, he had street smarts. At least that was how he read it. But Mr. Bias explained that he was an explorer. I guess a Jacques Cousteau. That he had studied police techniques for years and wanted to go to the crime scene and assist them in the investigation of the crime because of his knowledge. He indicated that he went to the 10th grade at Allen Elementary School. When asked to spell Allen, he basically told him he'd have to get back to him on it because he didn't know how to spell, read, or write. That's Mr. Bias. And we have split our Miranda, and it's in the brief. I'm not going to take up all that lengthy time because I think it's well briefed. But there's an issue about the voluntariness, then knowing and intelligently waiving. It's all set out, and I believe there's a strong case that we should have prevailed at the district court on that. Again, there was a certificate of appealability given with regard to that argument. And so we would ask certainly the court to give consideration to that. And as I said, just in the minute and a half I have left, I'll just briefly touch that this is a case that in August the defendant is extradited. In October, he is tried. He has one lawyer who was a civil lawyer who will eventually face, if not disbarment, at least disbarment proceedings, and one other lawyer. And that lawyer, who had never tried a murder case, said that he was a magistrate and he didn't get to try many cases. So we asked the court about trying, if he could try a couple of cases, and they were death penalty murder cases. We all know the lengths to which Ohio requires counsel to go through Rule 20 to keep at the cutting edge of both the law and all that goes on with death penalty cases. They went to trial in two months. At the end of that, the guilty verdict, and the judge said, I'll see you tomorrow for mitigation. I just had a death penalty murder case. My man was extradited in January, and in April we had a trial. Not April of that year, the following year. And we had already laid out the trial plan and mitigation was to occur three weeks after a guilty verdict, should there be a guilty verdict. Ultimately, that death penalty case was plea bargained down all the way to an involuntary manslaughter. Mr. Bias did not get effective representation. Thank you. Counsel, could I ask, is this the case or is it the gum case? Now I've forgotten what I was going to ask. I'll hold that thought. I suffer from what I call a seven second delay. Thank you very much. Now I've thought of it, if I can go ahead and ask you. In one of these cases, it was announced in the opening argument that the client would testify. Was that Bias? That was Bias, yes. And then he didn't testify. No. Is that right? That's correct. Thank you. Thank you. Mr. Kessner. Just to touch on a couple of things that were discussed. The first thing is, as far as the police interrogation of Petitioner Bias and his stature as a mentally retarded individual that was found in Atkins, the question that is supposed to be asked is, from the perspective of the police department, the police officers doing the investigation, I believe it's Garner, what would they have known that he suffered mental deficiencies? And as the district court found, there was nothing at the time of the interrogation that would have shown that he was so mentally retarded that he didn't understand his rights, that even though he did at first say that he had graduated 10th grade and had gone to Allen Elementary, he quickly corrected it and said that he meant high school. He continually would tell the officers that he understood his rights, that he knew that he had a right to an attorney. They had that on tape several times. They gave him his Miranda warnings twice, and there was no indication through any of that that he didn't understand any of those rights, and that's a finding by the district court. As far as the Brady material, specifically as to Cordray and Moore, the police officers did investigate both of them. With Roger Cordray, the statements that he had participated in the killing of Aaron Rains was found to be discredited by the officers. They went and found Roger Cordray. He denied knowing Aaron Rains. They took his sneakers and determined that the tread on his sneakers did not match the sneaker tread at the crime scene and that he had no link to Aaron Rains whatsoever. Did they also find that the shoe prints didn't match bias? There wasn't any physical evidence against bias, was there? No, they did not determine that the sneaker treads matched bias. I believe that's correct. Was there any other physical evidence? Outside of the confession and the fact that the detailed wounds on Aaron Rains all were corroborated by his confession, that was the bulk of the evidence used against him. Well, I have to say I'm a little worried about that entire procedure. It is, in fact, very easy to engender suggestibility in somebody whose mental facilities are no better than 50 to 60 point IQ. We don't know what they told him while the tape recorder was... So that he then came out with what he thought they wanted him to say. I mean, we know that the Central Park jogger case in New York, the Wilding case, they had five of those young men confess, and it turns out not a single one of them was guilty. Now, I don't know to what extent those young men were retarded, but the record shows beyond any doubt that this defendant was retarded. And if you've ever dealt with any mentally retarded people, you would understand, I think, that suggestibility is a real problem. I would agree that, in general, that suggestibility would be a problem, just that, in this particular case, there are no facts in the record that demonstrate that the petitioner brought out that he was coerced into his confession, that there were any acts by the officers that show any form of pressure. Well, suppose I say to you that there's no evidence of that in the record because they turned the tape recorder off, and we don't know what happened while it was off. I think, in that case, we would be denying what we do know from what was placed on the tape, what he said when he did his video walkthrough at the crime scene, the statements that he made driving back from Hazard, Kentucky. There's a host of factors in the record that demonstrate his knowledge of what was going on, including at mitigation. He understood the concept of doing an unsworn statement at mitigation. So I think all those things in the record help to support that he knew about what was going on in the case, and that it would be improper to try to speculate about what happened, perhaps, while the tape recorder was off. Well, I'm just going to suggest to you, and perhaps you could suggest it to the police departments that you deal with. When the police engage in this sort of practice, they are the ones that turn off the machine, and the presumption ought to be that they have something less than a really good motive for doing that. It may be that we can't do anything but speculate here, but it would certainly strike me that not only would judges be a little skeptical about this practice, but it could affect your jury verdicts too. I hope that's not a practice that they're still engaging in. I mean, the tape recorder is there for a reason, and the reason is to know exactly what goes on in the interrogation room, not half of what goes on. That's my sermon for today. And did the state courts make a finding on this? And what standard of review do we use? On the Brady claim, it was a procedurally defaulted claim. We believe the court should uphold the independent state ground and give deputy deference to the state court decision. Well, did they make a merits determination? They did make a brief merits determination. Was that under plain error or what? I apologize at this time. I don't know. I'm sorry. So that's the Brady claim. And what about the confession issue, the interrogation and so forth? Our position is that there was nothing at the time of the confession or the interrogation that would have led the officers to suspect that he was mentally retarded, that the standard as passed out in Garner is the fact that from the perspective of the police, he was able to answer questions. He said he understood his rights. The officers read line by line to him. The Miranda waiver form, during the first interrogation, during the second interrogation, they put it back on the record that he stated that he understood his rights and that he didn't want an attorney. They filled out a form the third time, and it was only the last interrogation that ended up happening off the record. Let me ask you this, just one more question. Is this the defendant that prompted the prosecuting attorney who tried the case to refer to him as retarded on several occasions during the trial? And as I recall, he then wanted to claim that it would be double jeopardy to have another hearing to determine whether or not he was mentally retarded. Was this the case in which the prosecutor told the jury on various occasions that he was retarded? I believe the record is that officers during the trial knew that he was a little bit slower, that he had some educational problems, but I don't believe they constantly referred to him as mentally retarded. Well, if they knew that during the trial, don't you think they knew that while they were interrogating him? How did they find out between the time they interrogated him and the time they testified that he was mentally retarded? There was no adjudication during trial that he was mentally retarded. Even his own expert had him at mild retardation during the course of the trial. It wasn't until the Atkins hearing that an official determination that he was in fact retarded. Well, you see, that's my point. Even without a true test, some kind of objective, accurate test to find out whether he's retarded or not, they seemed to know that at the time of trial. And my question is, if they understood that at the time of trial, why didn't they understand that while they were interrogating him? That's my question. I mean, you told me there was nothing in the record to indicate to them that he had any problem with his intellect, and obviously people knew he did, even without objective psychological testing. I think there's a significant difference between the officers having a witness or a defendant that they described as nervous and they knew that he had only gotten to 10th grade, so they were basing it off his lack of education and knowing that you have someone that is so susceptible and that is officially mentally retarded. I think there's a difference in what the – I just think there's a difference from that standpoint. All right. That's your position. Unless there's any other questions. Yeah. What about this issue of petitioner's counsel's failure to request a competency hearing to get a better fix on the mental status of the petitioner? Even if the counsel didn't do that, should the judge on his own have ordered a competency hearing in this case on these facts? No, because they did have a – I believe it was Dr. Schmidt-Gosselin did do a review of petitioner bias, and even through her determination only found him to be mildly on the borderline of retardation, and in her report stated that he understood the nature of the case, understood that he was being charged and what the trial was. So I don't think there's an issue of competency as far as him understanding what was going on. Of course you had a severely mentally retarded person and the possibility of the death penalty and you would have – and the issue of whether factually the defendant was being misled or led on in the interrogation. You would think with all that going on, the judge or his lawyer or someone would have asked for a competency examination. And again, I think it's from the people that were interacting with him, nobody at the time saw such a severe deficit that they thought competency to stand trial was an issue. I mean, his lawyer interacted with him daily. Like I said, you have the expert report that says he's understanding the charges against him, and I think it was from their perspective it was not a competency issue to stand trial. How old was Mr. Bees at the time of the crime? I'm sorry, I don't know. I think he was in his 20s. Okay, we can look it up. I apologize. But just for your information, let me just say that the difference between mildly retarded and borderline retarded can be as much as 20 points of IQ. Borderline is 70 and above, as I recall, and mildly is 70 down to 60. So we're not talking about somebody who just had learning problems. We're talking about somebody whose IQ was actually below that of someone who's mildly mentally retarded. And we've seen Schmidt-Gosling before, so I won't go into that. Thank you. Thank you both. The case will be submitted. Would the clerk call the next case?